

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLIAM EGAN,                          )
                                       )
          Plaintiff,                   )
                                       )
          v.                           )  Case No.: 1:05-cv-6752
                                       )
JO ANNE B. BARNHART                    )  Magistrate Judge Arlander Keys
Commissioner of                        )
Social Security,                       )
                                       )
          Defendant.                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff, William Egan, moves this Court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security, denying his claim for Disability
Insurance Benefits.  42 U.S.C.A. § 405(g)(Westlaw 2006).
Defendant has filed a Cross-Motion for Summary Judgment, asking
this Court to affirm the Commissioner's final decision.  For the
reasons set forth below, Plaintiff's motion is granted in part,
the Commissioner's Cross-Motion is denied, and this case is
remanded for further action consistent with this opinion.  The
Court finds that remand is appropriate in this case because of 1)
the ALJ's failure to list the specific physical requirements of
Mr. Egan's previous job and assess the plaintiff's ability to
perform those tasks; 2) the ALJ's failure to comply with SSR 96-
8p when assessing Mr. Egan's residual functional capacity

1

("RFC"); and 3) the ALJ's improper credibility determination regarding Mr. Egan's claims of pain.

## Procedural History

On June 24, 2002, Mr. Egan filed an application for Title II Disability Insurance Benefits, alleging that he became unable to work on October 30, 2000, due to knee, shin, and foot pain; gout; side effects from numerous medications; and low testosterone. R. at 55. His application was denied initially on September 6, 2002, and upon reconsideration, on December 20, 2002. R. at 21-25. Mr. Egan requested and received a hearing before an Administrative Law Judge ("ALJ"). ALJ Michael Logan heard the case on March 15, 2004. R. at 568. Mr. Egan, who was represented by attorney David Bryant, testified at the hearing. R. at 569-70. Vocational expert ("VE") Thomas Dunleavy also testified. R. at 569. On September 1, 2004, the ALJ found that Mr. Egan was not disabled, because he remained able to perform his past relevant work. R. at 17. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of that decision on October 7, 2005. R. at 4.

On November 29, 2005, Mr. Egan filed suit in this Court, pursuant to 42 U.S.C.A. § 405(g), seeking review of the ALJ's decision. The case was initially assigned to Judge Milton I. Shadur, and the parties subsequently consented to proceed before this Court.

## Background Evidence

The ALJ's decision was based upon the testimony at the hearing and the medical evidence in the record. The Court will discuss each category of evidence in turn.

### Testimony

At the hearing, the ALJ heard testimony from both Mr. Egan and Vocational Expert ("VE")Dunleavy. R. at 569.

### Mr. Egan's Testimony

Mr. Egan testified that he was 58 years old, was 6'3" tall, and weighed 250 pounds. R. at 572. Mr. Egan is married and lives with his wife, three adult sons, and one adult daughter-in-law. Id. Mr. Egan has a driver's license, but restricts his driving to short distances during the day. R. at 573-74.

Mr. Egan testified that, following his graduation from college, he worked for Illinois Bell, At&T, and Ameritech for approximately 32 years. R. at 574. After Mr. Egan retired from Ameritech, he worked as a consultant to SBC (which had bought Ameritech) from April of 2000 to October 30, 2000, when he allegedly became disabled. R. at 575.

Mr. Egan's last job, as a consultant to SBC, was to manage an information technology budget. R. at 575. Mr. Egan was required to attend meetings, travel, and to take conference calls, as well as to lift a briefcase, walk to and from meetings, walk up and down stairs, and walk in and out of elevators, which

3

totaled up to two hours of walking in an eight-hour day. R. at 577-79. Mr. Egan was also required to drive to other Ameritech locations. R. at 579. In addition, Mr. Egan testified that he would frequently make presentations, which required lifting paper presentation materials, weighing less than ten pounds, in and out of his trunk. R. at 580.

Mr. Egan testified that his health problems began with a kidney stone. R. at 583. He testified that he had various reactions to the medication prescribed to treat his kidney stone. R. at 584. He said that the medications drained him of energy, making it difficult for him to perform his job. *Id.* He said that the fact that he had worked at SBC until the end of October "was more of a gratuitous thing on the part of the people that I worked for there."[1] *Id.* Mr. Egan testified that in November of 2000, he was diagnosed with gout and had a "terrible reaction" to his gout medication. R. at 585.

After his bout with gout, Mr. Egan underwent surgery on his left knee.[2] R. at 585. Mr. Egan stated that he believed he was being over medicated as a result of his doctor's medical practice closing, thus requiring him to find a new doctor. *Id.* He

---

[1] Mr. Egan explained that, "I mean, I'd show up, that would be about it." R. at 583.

[2] Mr. Egan's medical records indicate that surgery was performed after Mr. Egan had an acute onset of sudden sharp pain while playing golf. R. at 313.

4

testified that, at this point he had no energy, wasn't able to breathe, and all of his limbs ached. *Id.*

Mr. Egan testified that in December of 2000, he went to physical therapy for his knee. R. at 586. From August of 2001 forward, he suffered from a meniscus tear and plantar fasciitis. *Id.* Mr. Egan testified that, from August of 2001 to August of 2002, he was unable to put weight on his feet, despite Cortisone injections in his foot, physical therapy, and use of orthotics. *Id.*

Mr. Egan stated that, in October of 2002, he was diagnosed with sleep apnea. R. at 589. Since then, he been sleeping with a mask/breathing device. *Id.*

Mr. Egan testified he takes numerous medications daily, including: aspirin, Lipitor, Tricor, Foltox, Verapamil, Urocit-K, Ambien, Provigil, Buspirone, Buspar, Prevocet, Naprosyn, and Hydrocodeine. R. at 593-94. He takes half an Ambien and half a Hydrocodeine at night, which, with the mask, allows him to sleep. R. at 594. He had been on these medications since August of 2003.

Mr. Egan also testified that he had fibromyalgia, but that Dr. Mikuzis had not told him much about this condition. R. at 597. He testified that, when Dr. Mikuzis would ask him how he was feeling, he would reply, "... the knees, the ankles, the feet, the toes [inaudible] I mean, it's, I look pretty healthy,

but it's kind of, you walk, I walk around all day long." R. at 597-98. When questioned about his fibromyalgia diagnosis by the ALJ, Mr. Egan indicated that he had not been through any kind of testing of tender points for fibromyalgia and had not been referred to a rheumatologist, but that he was in a pain management program at a pain clinic. *Id.*

Mr. Egan testified that, if he stands for fifteen minutes, then he needs to sit down for ten minutes, which would enable him to stand for another fifteen minutes, and so on. R. at 599. Mr. Egan also testified that he can sit in a straight-back chair for four hours in a workday, but only for thirty minutes at a time.

Mr. Egan said that his current routine is to wake up at 7:00 a.m. and read the paper. *Id.* His wife wakes up at 8:00 a.m. and makes coffee and then breakfast. *Id.* Mr. Egan then goes to a health club and walks in the swimming pool for about forty-five minutes. R. at 601-602. After returning home from the health club, Mr. Egan would do a "project" or "whatever she [his wife] wants to do, clean a room." R. at 602.

When asked by the ALJ about his ability to concentrate, Mr. Egan testified that he has no attention span and falls asleep when using a computer. R. at 603. However, Mr. Egan said he had no problems with falling asleep while driving (because he only drives for short periods) or when reading the paper. R. at 605. Mr. Egan said he is unable to walk a golf course. R. at 606.

6

Mr. Egan said he does not see a counselor, psychiatrist, psychologist, or support group for depression. R. at 607. However, Dr. Mikuzis did write him a prescription for Buspar, which is typically prescribed for depression. *Id.* When asked by the ALJ whether he thought he needed to see a support group for depression, Mr. Egan answered, "No, no. I just, again, that's a pretty recent prescription." R. at 607-608.

Mr. Egan testified that he had to interrupt projects to lie down and rest. R. at 610. For example, when his family was removing wallpaper, Mr. Egan said he was only able to help for twenty minutes. *Id.*

## VE Thomas Dunleavy's Testimony

VE Dunleavy asked Mr. Egan how many hours in a workday he was allowed to be seated. R. at 612. Mr. Egan answered two to three hours a day, and stated that he was on his feet the rest of the workday. *Id.* He said that people in five different states within the Ameritech regions reported to him, and he would spend time traveling to their locations to check their progress. R. at 613.

VE Dunleavy testified that, over the last 15 years, Mr. Egan's work was skilled and the exertion level was light. R. at 614. The ALJ then asked VE Dunleavy whether Mr. Egan had any transferrable skills, and the VE responded that Mr. Egan's skills were transferrable to the information technology area. *Id.*

The ALJ next asked whether a hypothetical 55-year-old person who had the same education and work history as Mr. Egan, who is able to lift up to ten pounds; who is unable to climb ladders, ropes, and scaffolds; who is able to occasionally climb ramps and stairs; who is able to occasionally balance or stoop, but never kneel, crouch, or crawl; who should avoid moderate exposure to dangerous machinery; and who could maintain concentration 95% of the workday, would be able to perform Mr. Egan's past work as he performed it, or as the work is performed in the national economy. R. at 615. VE Dunleavy answered that this hypothetical person would be able to perform Mr. Egan's past work as performed in the national economy. *Id.*

The ALJ then asked VE Dunleavy whether the same hypothetical person would be able to perform Mr. Egan's past relevant work as performed in the national economy if he was only able to sit for four hours a day and was only able to stand for half an hour a day. *Id.* The VE said that such an individual could perform "part-time work at best," as such restrictions would preclude competitive full-time employment. *Id.*

The ALJ then asked about a third hypothetical person, who was the same as the first person, but who was only able to maintain concentration 85% of the work day. R. at 616. The VE replied that being able to maintain concentration only 85% of the workday "would eliminate competitive employment." *Id.*

8

Mr. Egan's attorney then asked VE Dunleavy to clarify whether the hypothetical person described by the ALJ could return to Mr. Egan's past relevant work as he performed it, or only as it is performed in the national economy. R. at 617. The VE explained that, while the hypothetical person could return to Mr. Egan's past relevant work as it is performed in the national economy, he could not return to Mr. Egan's prior relevant work as he had performed it. *Id.*

## Medical Evidence[3]

The medical evidence in this case includes medical records from Mr. Egan's treating physicians and hospital stays, DDS physicians, physical therapy centers, and a sleep disorder center.

### A. Robert Atkenson, M.D.

In 1992, Dr. Robert Atkenson performed arthroscopic surgery on Mr. Egan's right knee to correct internal derangement. R. at 322-26. By September of 1992, Dr. Atkenson reported that Mr. Egan was experiencing only "annoying pain" in his right knee. R. at 325. In April of 1993, Dr. Atkenson wrote that Mr. Egan had no effusion and full stability in his right knee, and that he was "extremely pleased" with his progress. R. at 322.

---

[3] Not considered were the medical records of Pedro Quevedo, R. at 129-138, and Leon Husak, R. at 547, because these records have no obvious relevance to this case, and the parties have not explained their significance.

In July of 1996, a magnetic resonance image ("MRI") of Mr. Egan's right knee showed a linear tear in his meniscus. R. 307-308. By January of 1997, Dr. Atkenson recommended that Mr. Egan undergo arthroscopic surgery in his right knee. R. at 319. Mr. Egan had the surgery in February of 1997. R. at 316. Dr. Atkenson wrote afterwards that Mr. Egan was doing "extremely well." *Id.*

Mr. Egan saw Dr. Atkenson again in May of 1999. R. at 123. Dr. Atkenson diagnosed Mr. Egan with arthritis in his left knee, a ruptured ACL, and Poss TM 2. *Id.* On a pain questionnaire dated May 24, 1999, Mr. Egan described his pain as "only annoying," with a "cutting" and "stabbing" quality, and that the pain was "intermittent." R. at 124. He said this prevented him from kneeling, turning laterally, and golfing. *Id.* He reported that he was getting better and that "doing nothing" alleviated much of the pain. *Id.*

In February of 2001, Mr. Egan described his pain as "only annoying," with a "stabbing" quality and "intermittent." R. at 119. Nevertheless, in March of 2001, Dr. Atkenson performed arthroscopic assisted anterior cruciate ligament reconstruction surgery on Mr. Egan's left knee for severe anterolateral rotatory instability of the knee and severe arthritis of the medial compartment. R. at 359-60.

By April of 2001, Mr. Egan reported that he was getting better, was using crutches, and was beginning his third week of physical therapy. R. at 114. Mr. Egan said he had a little joint swelling in his knee, as well as numbness and burning, but that the limitation to his movement was mild. R. at 116. By May of 2001, Mr. Egan described his pain as "only annoying" and "burning" and reported that he was doing better, although he was still unable to climb steps or kneel. R. at 111. In July of 2001, Mr. Egan said that his pain was a "dull ache," "intermittent" and "only annoying." R. at 110. He reported that he was no longer able to kneel or golf, but that he was getting better. Id.

In an "Arthritic Report" prepared on November 29, 2002, for the Illinois Bureau of Disability Determination Services, Dr. Atkenson reported that Mr. Egan can stand or walk for thirty minutes, needs to include periods of walking around during an eight-hour day, can sit or stand at a stretch for ten minutes, and needs a job which permits shifting positions from sitting to standing to walking, at will. R. at 106.

## St. Alexius Medical Center

After experiencing back pain and blood in his urine, Mr. Egan visited the St. Alexius Medical Center Emergency Room on August 8, 2000. R. at 133. He was diagnosed with a kidney stone, R. at 142, and was discharged the same day, with a

11

prescription for vicodin and a referral to see a urologist, R. at 146.

## Palos Community Hospital

After Mr. Egan's Emergency Room visit, he was admitted to Palos Community Hospital on August 10, 2000. R. at 153. He was diagnosed with Urosepsis and a kidney stone. Id. He stayed at the hospital for seven days. R. at 154. He underwent an abdominal CT scan, which confirmed a left hydroenphrosis secondary to a distal 4 x 4 millimeter stone at the ureterovesical junction. Id. Dr. Hoyme was scheduled to perform surgery to remove Mr. Egan's kidney stone on August 11, 2000, but Mr. Egan's 101° temperature and low oxygen saturation prevented him from doing so. R. at 162. Instead, Dr. Hoyme inserted a stent. Id. Dr. Hoyme performed a second surgery of Mr. Egan on September 1, 2000 and successfully removed the kidney stone.[4] R. at 203, 207.

## Meyer Medical Physicians Group

Mr. Egan had an x-ray of his right knee in May of 1992. R. at 309. The x-ray revealed an area of osteochondrosis desecans involving the distal right femur and suprapatellar effusion. Id. Mr. Egan had another x-ray of his right knee in July of 1996. R. at 308. The x-ray revealed mild degenerative changes throughout

---

[4] This operation was performed at Advocate Christ Medical Center.

12

the knee joint.  *Id.*  In August of 1996, Mr. Egan had an MRI of his right knee, which revealed a linear tear to the posterior horn of the medial meniscus and a small amount of joint effusion. R. at 305.

Mr. Egan had an MRI of his left knee in May of 1999.  R. at 296.  There was a suggestion of complete disruption of the femoral attachment of the anterior cruciate ligament.  *Id.*

## St. Francis Hospital

Mr. Egan was admitted to St. Francis Hospital and Health Center on March 14, 2001.  R. at 352.  He underwent Arthroscopic Assisted Anterior Cruciate Ligament Reconstruction on his left knee the same day, because of severe anterolateral rotatory instability of the knee, and severe arthritis of the medial compartment.  R. at 359, 361.

## Orland Therapy Specialists

Progress Notes indicate that Mr. Egan received physical therapy at Orland Therapy Specialists, thirty-seven times between April 9, 2001 and July 2, 2001.  *Id.*  By June 28, 2001, Daniel Ryba, Mr. Egan's physical therapist, wrote that, after six weeks of physical therapy three times per week, Mr. Egan continued to have persistent weakness of the left knee, which was contributing to adaptive biomechanics and right knee/low back pain.  R. at 376.  Mr. Ryba recommended that Mr. Egan continue physical therapy on his left knee.  *Id.*

13

## Maximum Rehabilitation Services

Mr. Egan again sought physical therapy in late 2001, after experiencing severe foot pain. R. at 403. Between December 19, 2001 and February 5, 2002, Mr. Egan visited Maximum Rehabilitation Services thirteen times for physical therapy. *Id.* He was diagnosed with plantar fasciitis. *Id.* By the end of treatment, Svetlana Rimmer, Registered Physical Therapist, stated that he had made very good progress in physical therapy and had demonstrated improvement in balance, flexibility exercises, stair climbing, stair descending, and walking. *Id.*

## Stanley Rabinowitz, M.D.

Dr. Rabinowitz, a DDS-selected doctor, examined Mr. Egan for thirty minutes on August 21, 2002. R. at 433. In a letter to the State of Illinois Disability Determination Services, dated August 22, 2002, Dr. Rabinowitz listed his impressions as: 1) history of gout, 2) history of plantar fasciitis, 3) degenerative joint disease, 4) history of internal derangement, knees, status post bilateral knee surgical reparative procedures with persistent pain, 5) chronic LS pain syndrome, 6) chronic myofascial pain syndrome, 7) "essential hypertension, ? [sic] control on therapy, without end organ dysfunction," and 8) history of fatty liver, causation undetermined. R. at 437-38. In the same letter, Dr. Rabinowitz noted in the "present illness" section that, "[t]he patient currently complains that he lacks

14

stamina and fatigues easily. He sleeps without difficulty. He is depressed and short of breath." R. at 433.

## Residual Functional Capacity Assessment

Dr. Francis Vincent, a non-examining DDS-selected doctor, completed a residual functional capacity ("RFC") assessment of Mr. Egan on September 3, 2002. R. at 438, 446. Dr. Vincent determined that Mr. Egan was able to occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull without limitation. R. at 440. Dr. Vincent determined that Mr. Egan could climb a ramp or stairs occasionally, but could never climb a ladder, rope, or scaffold. R. at 441. Dr. Vincent found that Mr. Egan had no manipulative, visual, or communicative limitations. R. at 442-43. With respect to environmental hazards, Dr. Vincent found that Mr. Egan should avoid concentrated exposure to hazards (machinery, heights, etc.). R. at 443.

## Roy Bliley, M.D.

Mr. Egan had a lung exam in October of 2002, which showed no ventilation or perfusion defect and negative chest, low probability for pulmonary emboli. R. at 462. Mr. Egan also had a chest x-ray in October of 2002. R. at 463. There was a prominence of lung markings with no focal infiltrate. *Id.*

## Rafia Saleem, M.D.

Dr. Rafia Saleem reviewed x-rays taken of Mr. Egan on August 25, 2001. R. at 468. Dr. Saleem ordered an x-ray of Mr. Egan's right foot, which revealed a mild hallux valgus deformity. *Id.* An x-ray of Mr. Egan's left foot, revealed soft tissue swelling and small erosions involving the head of the first metatarsal and base of the proximal phalanx of the first toe consistent with the clinical diagnosis of gout. Mr. Egan was referred to Maximum Rehabilitation Services for physical therapy. R. at 474.

## Action Physical Medicine and Rehabilitation

Mr. Egan sought treatment at Action Physical Medicine and Rehabilitation ("Action") on May 9, 2003. R. at 507. He listed his medications as Tricor, Urocit-k, Verapamil SR, Ibuprofen, Naproxen, Ambien, Provigil, and Prevacid. *Id.* He listed his symptoms as fatigue, needing glasses, respiratory shortness of breath, constipation, muscular pain, decreased range of motion, and depression. *Id.* On a diagram of a human male, Mr. Egan showed his pain occurring in both knees and in his right calf. R. at 508. He also marked his level of pain as 4 to 6 on a scale of 10. *Id.* A staff member at Action listed Mr. Egan's pain exacerbating factors as movement/activity, bending/exercise, sitting/standing, and coughing/sneezing. R. at 509. The staff member listed Mr. Egan's symptoms as difficulty sleeping/fatigue, joint/muscle pain, muscular weakness, anxiety/depression,

16

shortness of breath/cough, constipation, and wearing glasses.
*Id.* His level of pain was 4 on a scale from 0 to 10.

On a follow-up visit on June 23, 2003, only joint/muscle
pain was listed as a symptom and Mr. Egan's pain was listed as a
2.  R. at 511.

On February 17, 2004, Dr. Mikuzis wrote to the Social
Security Administration to report that Mr. Egan has been in his
care since May 9, 2003, and suffers from polyarthritis DJD
bilateral lower extremity, sleep disorder, contractures bilateral
hamstrings, myofascial pain, lumbar pain, bilateral knee pain,
and fibromyalgia.  R. at 561.  Dr. Mikuzis listed Mr. Egan's
medications as: Aspirin 325mg, Lipitor 20mg, Tricor 160mg, Foltx
1 per day, Verapmil Sr 180mg, Urocit-k 10meq, Ambien 10mg,
Provigil 200mg, Buspirone 15mg, Prevacid 30 mg, Naproxen 500mg,
and Hydrocodone 10mg.  *Id.*  Finally, Dr. Mikuzis stated that Mr.
Egan was permanently disabled.  *Id.*

## Southwest Physical Therapy & Rehabilitation

Mr. Egan received physical therapy fourteen times at
Southwest Physical Therapy & Rehabilitation between June 25, 2003
and July 30, 2003.  R. at 516-28, 530.  On August 1, 2003, Meg
Clark, a physical therapist, wrote to Dr. Mikuzis of Action that
the goals of improving walking tolerance to thirty to forty-five
minutes, decreasing pain, improving quad strength, improving
muscle flexibility and patellar mobility and establishing an

17

independent home exercise program had been achieved. R. at 529. She wrote, "he [Mr. Egan] reports he has not walked this good in 4 years." *Id*.

## Sleep Disorders Center

Mr. Egan underwent a sleep study in October of 2002. R. at 531. He was diagnosed with severe obstructive sleep apnea syndrome. *Id*. He began using a nasal CPAP machine and afterwards reported significant improvement in his condition. *Id*.

Mr. Egan underwent another sleep study in March of 2003. R. at 532. He was diagnosed as having mild obstructive sleep apnea syndrome. *Id*. He was told to continue using the CPAP machine and was prescribed Ambien and Provigil. *Id*.

Mr. Egan visited the Sleep Disorders Center in April of 2003 to discuss his treatment for obstructive sleep apnea syndrome. R. at 533. He reported that he no longer took Ambien or Provigil due to improved daytime function and that he was using the CPAP nightly. *Id*.

## The ALJ's Decision

The ALJ issued his decision on September 1, 2004. R. at 17. The ALJ reviewed the entire record and applied the Five Step sequential process set forth in the Commissioner's regulations for evaluating disability. R. at 13-17. The ALJ first determined that Mr. Egan had not engaged in disqualifying

18

substantial gainful activity during the relevant time. R. at 13-14.

Next, the ALJ concluded that Mr. Egan's sleep apnea, mild restrictive lung defect, periodic left foot gout, a right foot mild hallux valgus deformity, status-post ACL reconstruction, moderate kyphosis of the throacic spine, status-post left knee degenerative arthritis, status-post right knee internal derangement, and status-post kidney stone removals were severe impairments, under Step Two of the regulations. R. at 14. The ALJ found that there was no underlying work-up to support a diagnosis of fibromyalgia, nor was there any evidence to support depression as an impairment. *Id.* The ALJ determined that Mr. Egan's impairments, neither alone nor in combination, met or equaled the criteria of any section of the Listing of Impairments. *Id.*

At Step Four, the ALJ assessed Mr. Egan's residual functional capacity ("RFC"). *Id.* The ALJ first discussed Mr. Egan's medical records. *Id.* The ALJ listed Mr. Egan's symptoms as: fatigue, shortness of breath, multiple joint pains, foot and shin pain from gout, knee pains from arthritis, and an inability to bend over or walk up and down stairs. *Id.* The ALJ noted that Mr. Egan said he could walk for thirty minutes and sit four hours during an eight-hour day. *Id.* The ALJ discussed Mr. Egan's kidney stone, which occurred in August of 2000, but said that

19

there was no evidence of recurrence. *Id.* Next, the ALJ
discussed Mr. Egan's right and left knee derangements, left knee
surgery, and subsequent physical therapy. *Id.* The ALJ noted
that Dr. Atkenson, Mr. Egan's treating physician, reported Mr.
Egan's response to treatment was "good." R. at 15. The ALJ
acknowledged that Mr. Egan has complained of shortness of breath,
but at worst, testing showed a mild restrictive lung defect. *Id.*

The ALJ then stated that the remainder of Mr. Egan's medical
records failed to support a finding of complete disability. *Id.*
The ALJ pointed to the fact that Dr. Rabinowitz's exam revealed
no sitting limitations; Mr. Egan's report of mild exercise and
aquatic therapy; that Mr. Egan's gout was periodic in nature; and
that Mr. Egan's sleep apnea was mild and well-controlled with a
CPAP machine. *Id.* The ALJ said that Mr. Egan's allegations of
difficulty concentrating were not supported by credible evidence,
because Mr. Egan had demonstrated his ability to recall his
personal history in a consistent, accurate manner. R. at 16.

The ALJ then concluded that Mr. Egan was capable of
performing a range of sedentary work, which requires lifting and
carrying ten pounds at a time or small objects occasionally, with
only occasional standing and walking. *Id.* Mr. Egan's shortness
of breath, joint pain, and medication side-effects prohibited him
from crawling, kneeling, or climbing ladders, ropes, or
scaffolds. *Id.* In addition, the ALJ concluded that Mr. Egan can

20

only occasionally balance, crouch, or climb ramps or stairs, and he cannot work at unprotected heights or around dangerous machinery. *Id.*

Next, the ALJ wrote that VE Dunleavy had been questioned about a hypothetical individual with the same vocational profile and work limitations as Mr. Egan. VE Dunleavy had stated that such an individual could return to past work as a corporate manager as that job is generally performed in the national economy.

Finally, the ALJ determined that Mr. Egan remained capable of returning to his past relevant work, as generally performed in the national economy, and thus was not disabled. *Id.*

## Standard of Review

In reviewing the ALJ's decision, the Court may not substitute its own judgment for that of the Commissioner, reevaluate the facts, or re-weigh the evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the Commissioner, not the courts, is responsible for making that decision. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, the Court will uphold the ALJ's decision if it is based on proper legal criteria and supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d

21

863, 869 (7th Cir. 2000); *see also* 42 U.S.C.A. § 405(g)("[T]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive"). While substantial evidence is "more than a mere scintilla" of proof, it is no more than "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Above all, the Court need not determine whether the claimant is disabled. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).

The Court's limited power of review does not grant the ALJ unlimited judicial deference. The ALJ must consider and minimally articulate an analysis of all relevant, and even conflicting, evidence. *Herron*, 19 F.3d at 333 (*quoting Ray v Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)). While failing to articulate reasons for accepting or rejecting entire lines of evidence falls below this minimum level of articulation, *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993)(per curiam), the ALJ need not make a written evaluation of each piece of evidence or testimony. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). In order for the Court to trace the path of the ALJ's reasoning, *Carlson*, 999 F.2d at 181, the ALJ "must build an accurate and logical bridge from the evidence to his conclusion," *Clifford*, 227 F.3d at 872.

## Social Security Regulations

Under the Social Security Regulations (the "Regulations"), the ALJ must proceed through a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520 (Westlaw 2006). The ALJ must consider whether the claimant: (1) is currently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or medically equals any impairment listed in the Regulations as being so severe as to preclude gainful activity; (4) is unable to perform his past work; and (5) is capable of performing work in the national economy. See 20 C.F.R. §§ 404.1520 and 416.920; see also Young v. Sec'y of Health and Human Servs., 957 F.2d 386, 389 (7th Cir. 1992). An affirmative answer at steps three and five leads to a finding of disabled. Clifford, 227 F.3d at 868. A negative answer at any step, other than step three, leads to a finding of not disabled. Id. The burden of proof is on the claimant through step four, then shifts to the Commissioner at step five. Id.

Residual functional capacity is what a claimant can still do despite the claimant's physical and mental limitations. Hickman v. Apfel, 187 F.3d 683, 689 (7th Cir. 1999); 20 C.F.R. § 404.1545(a). The claimant's RFC is used at steps four and five of the sequential analysis to determine the claimant's ability to engage in various levels of work (sedentary, light, medium,

23

heavy, or very heavy). 20 C.F.R. § 404.1567. According to the Regulations, and as explained in SSR 96-8p, the ALJ must assess the claimant's work-related abilities on a "function-by-function basis," considering all relevant evidence, including physical, mental, and any other abilities affected by the claimant's impairments. SSR 96-8p; *see* 20 C.F.R. §§ 404.1545 and 416.945; *see also Cass*, 8 F.3d at 555.

Furthermore, while the Commissioner is responsible for developing the claimant's complete medical history, the claimant is responsible for "providing the evidence [the Commissioner] will use to make a finding about [his RFC]." 20 C.F.R. § 404.1545(a)(3). The claimant must "provide evidence showing how [his] impairment(s) affect [his] functioning" and ability to work. 20 C.F.R. § 404.1512©). Again, the ALJ's RFC determination must be supported by substantial evidence in the record. *Clifford*, 227 F.3d at 869.

## Discussion

Mr. Egan argues that the ALJ's decision should be reversed or remanded, because it is not supported by substantial evidence. Mr. Egan presents four challenges to the ALJ's decision, arguing that the ALJ's step two determinations, RFC findings, past work findings, and credibility determinations were erroneous. The Court will discuss these contentions in turn.

The ALJ's Step Two Determination

First, Mr. Egan asserts that the ALJ failed to account for his fibromyalgia, myofascial pain disorder, and depression at step two, which requires Mr. Egan to establish that he has a "medically severe impairment or combination of impairments" that significantly limit his ability to work. *See* 20 C.F.R. §§ 404.1520(a)-(c); 416.920(a)-(c). The Commissioner responds that the ALJ appropriately evaluated Mr. Egan's claims.

Step two of the five-step sequential analysis is a threshold determination that requires Mr. Egan, who bases his claim for benefits on multiple impairments, to show only that he has one severe impairment. *Cf. Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)("Having found that one or more of [the claimant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of the entire constellation of ailments - including those impairments that in isolation are not severe."); *Hickman*, 187 F.3d at 688 (in the case of an ALJ who first concluded that the claimant's impairment did not meet or equal a listed impairment, and then on that basis reached the conclusion that the impairment was not severe, "It is quite apparent that severity is merely a threshold requirement..."); 20 C.F.R. § 404.1520 (evaluation of disability in general), 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity

that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520)"), 20 C.F.R. § 416.920 (evaluation of disability in adults, in general).

In performing the step two analysis, the ALJ found that Mr. Egan had nine severe impairments: 1) sleep apnea, 2) mild restrictive lung defect, 3) periodic left foot gout, 4) a right foot mild hallux valgus deformity, 5) status-post ACL reconstruction, 6) moderate kyphosis of the throacic spine, 7) status-post left knee degenerative arthritis, 8) status-post right knee internal derangement, and 9) status-post kidney stone removals. R. at 14.

After the ALJ found that Mr. Egan had multiple severe impairments, and considering the combined effect of all of Mr. Egan's impairments, 20 C.F.R. § 404.1523, the ALJ proceeded to step three of the sequential analysis. It is thus irrelevant that the ALJ did not make a specific step two finding for Mr.

26

Egan's claims of fibromyalgia, myofascial pain disorder, and depression, as the ALJ had already determined that Mr. Egan had at least one severe impairment.

Additionally, the Court notes that the ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, *Carlson*, 999 F.2d at 181, and that the evidence in the record of Mr. Egan's fibromyalgia, myofascial pain disorder, and depression is slight. For example, Mr. Egan's pain management doctor, Dr. Mikuzis circling fibromyalgia in August of 2003, R. at 567, DDS-selected doctor, Dr. Rabinowitz listing "chronic myofascial pain syndrome," as an impression, R. at 438, and stating that Mr. Egan is "depressed and short of breath," R. at 433, a reference to depression in Dr. Mikuzis's notes, R. at 567, and a prescription for Buspar, R. at 607. Furthermore, when the ALJ questioned Mr. Egan about his fibromyalgia diagnosis, Mr. Egan indicated that he had not been through any kind of testing of tender points for fibromyalgia and had not been referred to a rheumatologist, R. at 597-98. When asked about his depression, Mr. Egan stated only that he was prescribed Buspar and had never seen a counselor, psychiatrist, psychologist, or been to a support group. R. at 607-608.

Nonetheless, as Mr. Egan offers four arguments in support of his claim that the ALJ erred at step two, the Court will address each of his arguments in turn.[5]

First, Mr. Egan argues that "the ALJ should have called upon an ME [medical expert] to advise him," citing to the applicable regulations. The relevant portion of 20 C.F.R. § 404.1529(b) states that: "At the administrative law judge hearing... the adjudicator(s) may ask for and consider the opinion of a medical or psychological expert concerning whether your impairment(s) could reasonably be expected to produce your alleged symptoms." The key word of § 404.1529(b) is "may;" the regulation does not require the ALJ to ask for and consider the opinion of a medical expert. *Siedlecki v. Apfel*, 46 F. Supp. 2d, 729, 732 (N.D. Ohio 1999)("the relevant regulations give the ALJ discretion to decide whether or not to call on a medical advisor.") Thus, it is not

_____

[5] Mr. Egan also argues that it is legal error for the ALJ, when assessing the pain and symptoms associated with an individual's fibromyalgia, to discredit the reports of physicians or the claimant simply because of a lack of so-called objective criteria. Mr. Egan cites to *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996), in support of his proposition. The Court does not agree with Mr. Egan's interpretation of *Sarchet*. In *Sarchet*, the court stated that there was no serious doubt that Ms. Sarchet was afflicted with fibromyalgia, but that it was difficult to determine the severity of her condition because of the unavailability of objective clinical tests. *Id.* at 307. The court concluded that the ALJ could have believed or disbelieved Ms. Sarchet's testimony regarding pain, but that the court could not uphold a decision where the ALJ's decision did not build an accurate and logical bridge between the evidence and the result. *Id.*

28

error for the ALJ to exercise his discretion to not seek a
medical expert.

Next, Mr. Egan argues that it was error for the ALJ to not
have requested medical source statements. Mr. Egan argues that
the regulations require the medical source statement, citing to
20 C.F.R. § 404.1519n as stating that, "we will ordinarily
request, as part of the consultative examination process, a
medical source statement about what you can still do despite your
impairment(s)." Mr. Egan's selective citation oversells the
regulation as a mandate. In fact, 20 C.F.R. § 404.1519n(c)(6)
provides that: "Although we will ordinarily request, as part of
the consultative examination process, a medical source statement
about what you can still do despite your impairment(s), the
absence of such a statement in a consultative examination report
will not make the report incomplete." When read in context, the
very regulation that Mr. Egan relies upon undercuts his argument.

Mr. Egan then argues that the ALJ's disregard for Mr. Egan's
mental illness and the opinion of Dr. Mikuzis is contrary to
*Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995). Mr. Egan quotes
*Wilder,* 64 F.3d at 337-38, as stating:

> Severe depression is not the blues. It is a mental
> illness; and health professionals, in particular
> psychiatrists, not lawyers or judges, are the experts
> on it. [*Wilder*] is entitled to a decision based on the
> record rather than a hunch. The salient fact of record
> is the testimony of the psychiatrist, a disinterested
> as well as expert witness. Everything else is rank
> conjecture.

29

However, *Wilder* is inapposite to Mr. Egan's case. In *Wilder*, the ALJ appointed a psychiatrist to evaluate the claimant's mental condition, but then rejected the psychiatrist's conclusions that the claimant was suffering from disabling depression. *Id.* at 336. The *Wilder* court was concerned that the ALJ had rejected the only medical opinion in the case, which he himself had sought, "concerning the critical issue of the date of onset of [the claimant's] depression." *Id.* at 337. In this case, the only evidence of depression is Dr. Mikuzis, Mr. Egan's pain management doctor, mentioning depression once in Mr. Egan's medical records, R. at 567, and Dr. Mikuzis prescribing Buspar for Mr. Egan, R. at 607. Dr. Mikuzis' mentioning depression once in Mr. Egan's medical records is not analogous to the situation in *Wilder*, where a psychiatrist testified that the claimant suffered from disabling depression. Here, unlike in *Wilder*, the ALJ did not ignore any psychiatric testimony or records supporting a diagnosis of depression, because there were none.

Mr. Egan's final challenge to the ALJ's step 2 determination is more persuasive than the others, but still does not require remand or reversal. Mr. Egan argues that, under 20 C.F.R. § 404, Subpart P, Appendix 1, the ALJ should have referred Mr. Egan for psychological testing. However, no part of Appendix 1 requires an ALJ to refer a claimant for psychological testing; 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(1)(a) says only that "[w]e

30

will make every reasonable effort to obtain all relevant and available medical evidence about your mental impairment(s). . ."

Mr. Egan concedes that he had submitted all of his medical records to the ALJ. Moreover, Mr. Egan has been treated by numerous physicians, none of whom (apparently) referred him to or suggested psychological testing.

In conclusion, it is not relevant that the ALJ did not make a specific step two finding for Mr. Egan's claims of fibromyalgia, myofascial pain disorder, and depression, as the ALJ had already determined that Mr. Egan had at least one severe impairment. *Cf. Golembiewski*, 322 F.3d at 918; *Hickman*, 187 F.3d at 688; 20 C.F.R. §§ 404.1520, 404.1523, 416.920.

## The ALJ's RFC Finding

Mr. Egan challenges the ALJ's RFC finding in regard to: 1) Mr. Egan's ability to sit; 2) his failure to consider the aggregate effect of Mr. Egan's impairments; and 3) his failure to discuss Mr. Egan's ability to perform work.

Mr. Egan argues that the ALJ made an improper RFC finding, because the ALJ ignored medical evidence that Mr. Egan cannot sit for longer than ten minutes, citing to Dr. Atkenson's opinion dated November 29, 2002.[6] R. at 106. Specifically, Mr. Egan

---

[6] Dr. Atkenson's opinion is found in an Arthritic Report sent to him from the Bureau of Disability Determination Services. The Arthritic Report asks, "How long can the individual sit or stand at a stretch," to which Dr. Atkenson answers, "10."

31

asserts that the ALJ favored Dr. Rabinowitz's report over Dr. Atkenson's report[7]. The Commissioner responds that the treating physician's opinion was not supported by sufficient clinical findings and was directly contradicted by Mr. Egan's own testimony that he could sit for four hours. R. at 600 - 601.

The Court agrees with the Commissioner. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight, only if it is supported by the medical findings and is consistent with substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see* 20 C.F.R. § 404.1527(d)(2). But an ALJ "is not required or *indeed permitted* to accept medical evidence if it is refuted by other evidence--which need not itself be medical in nature." *Wilder*, 64 F.3d at 337 (emphasis added). In this case, Mr. Egan's own testimony at the hearing was that he could sit for four hours during an eight-hour day, but not for more than thirty minutes at a time. R. at 601.

---

[7]     The ALJ did note that Dr. Rabinowitz's summary of his examination of Mr. Egan disclosed no limitations on sitting. R. at 15.   This statement however, does not concern the ALJ favoring one doctor over another, as Mr. Egan suggests, but rather, concerns Mr. Egan's credibility. In his decision, the ALJ's statement concerning the lack of a limitation on sitting is included in a discussion regarding credibility: "[t]he remainder of the medical evidence fails to support a finding of complete disability," and, "[t]hus, although the claimant has an underlying medically determinable impairment that could reasonably cause the symptoms alleged, the medical evidence does not support these symptoms to the degree alleged by the claimant." *Id.*

32

At the hearing, the ALJ questioned Mr. Egan regarding his ability
to sit.

Q: So, what do you think you'd do for sitting? What did you
say?

A: Half hour.

Q: Out, out of eight hours?

A: Oh.

Q: No, the whole eight hour period, what do you think you
can do?

A: Half of that, I would say four hours.

Q: At most a half of an hour at a time, that's what you're
saying, right?

A: Right.

In addition, Mr. Egan answered the question, "Are you able
to sit for at least 2 hours," which was part of an "Activities of
Daily Living Questionnaire" provided by the DDS, by writing, "I
can sit for at least 2 hours but I'm constantly shifting from
side to side, extending my legs out so they don't tighten up, and
standing to relieve pain and knee swelling."  R. at 79.
In light of this testimony, the Court agrees with the
Commissioner that it was both reasonable as well as required
under *Wilder*, for the ALJ to disregard Dr. Atkenson's report to
the extent that it was contrary to Mr. Egan's own testimony.

Mr. Egan also argues that the ALJ's RFC finding was erroneous, because the ALJ did not consider the aggregate effect of his obesity on his impairments. The Commissioner responds that Mr. Egan fails to address in any meaningful fashion how the ALJ's RFC assessment fails to incorporate limitations caused by Mr. Egan's supposed obesity.

Mr. Egan asserts that the ALJ violated Social Security Ruling 02-1p, which states that the adjudicator "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p. According to SSR 02-1p, an ALJ should consider the effects of obesity with the underlying impairments, even if the claimant does not claim obesity as an impairment. *See Clifford*, 227 F.3d at 873. However, a failure to explicitly consider the effect of obesity may be harmless error. *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). Although an ALJ does not address the claimant's obesity in his decision, the ALJ's adoption of the "limitations suggested by the specialists and reviewing doctors" who were aware of the condition in combination with the claimant's failure to "specify how his obesity further impaired his ability to work," renders the error harmless. *Id.* at 736-37 (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

The ALJ's implicit consideration of Mr. Egan's obesity
through his review and discussion of his doctors' reports[8], which
noted Mr. Egan's height and weight and advised him to lose weight
though never diagnosed him as obese, is sufficient, *See
Prochaska,* 454 F.3d at 736-37; *Skarbek,* 390 F.3d at 504.   For
example, the ALJ noted that Mr. Egan reported to Dr. Mikuzis, his
pain management doctor, that his pain level on a scale from 1-to-
10 was between 2 and 4 in his lower back and knees and 4 in his
lower legs.  R. at 14.   The ALJ recounted that Dr. Atkenson, Mr.
Egan's orthopedic surgeon, said that Mr. Egan needed to sit,
stand, or walk as he wanted, but needed no assistive device to
ambulate.  R. at 15.   The ALJ also wrote that Dr. Atkenson said
that Mr. Egan had a short stride and slow cadence, bilateral knee
stiffness, effusion and quadriceps atrophy, but that there was no
redness or warmth, fatigue, fever, malaise, weight loss or
ankylosis.  *Id.*

The ALJ considered the above doctors' reports when he
concluded that "the medical evidence and credibility factors
detailed above are consistent with an individual who cannot stand
and walk frequently, and cannot do heavy lifting," R. at 16,
which were limitations suggested by Mr. Egan's doctors.   Mr. Egan
also has not explained, either at the hearing or in his brief,

_____

[8] for example, Dr. Atkenson recommended weight reduction via
a low fat diet "because of its beneficial effects for his [Mr.
Egan's] overall health."   R. at 322

how his obesity affects him. Thus, any error committed by the
ALJ in not specifically describing the limitations linked to Mr.
Egan's obesity was harmless.

Mr. Egan next argues that the ALJ made an improper RFC
finding when he failed to discuss his ability to perform work
activities for eight hours per day, five days per week. The
Court agrees.

At step four the ALJ must determine whether the claimant has
the RFC to perform his past work. See 20 C.F.R. §§ 404.1520 and
416.920. SSR 96-8p provides guidance in determining the
claimant's physical and mental RFC. *Gotz v. Barnhart*, 207 F.
Supp. 2d 886, 896 (E.D. Wis. 2002). SSR 96-8p states:

> Ordinarily, RFC is an assessment of an individual's
> ability to do sustained work-related physical and
> mental activities in a work setting on a regular and
> continuing basis. A 'regular and continuing basis'
> means 8 hours a day, for 5 days a week, or an
> equivalent work schedule.
>
> ... The RFC assessment is a function-by-function
> assessment based upon all of the relevant evidence of
> an individual's ability to do work-related activities.
>
> ... Exertional capacity addresses an individual's
> limitations and restrictions of physical strength and
> defines the individual's remaining abilities to perform
> each of seven strength demands: Sitting, standing,
> walking, lifting, carrying, pushing, and pulling. Each
> function must be considered separately (e.g., "the
> individual can walk for 5 out of 8 hours and stand for
> 6 out of 8 hours")...
>
> ... The RFC assessment must include a narrative
> discussion describing how the evidence supports each
> conclusion, citing specific medical facts (e.g.,
> laboratory findings) and nonmedical evidence (e.g.,

daily activities, observations). In assessing RFC, the
adjudicator must discuss the individual's ability to
perform sustained work activities in an ordinary work
setting on a regular and continuing basis (i.e., 8
hours a day, for 5 days a week, or an equivalent work
schedule), and describe the maximum amount of each
work-related activity the individual can perform based
on the evidence available in the case record.

The ALJ failed to engaged in the "function-by-function"
assessment required by SSR 96-8p. Rather, the ALJ's decision
addressed only Mr. Egan's sitting and walking limitations. "He
said he can walk 30 minutes and sit four hours during an eight-
hour day." R. at 14. There is no similar treatment of Mr.
Egan's standing, lifting, carrying, pushing, and pulling
functions. In addition, the ALJ's opinion did not include a
narrative discussion describing how the evidence supports each
conclusion.

Because the ALJ failed to articulate his analysis of Mr.
Egan's medical history or nonmedical evidence supporting Mr.
Egan's alleged limitations, or provide a function-by-function
assessment, the ALJ did not comply with SSR 96-8p. SSR 96-8p
requires the ALJ to explain how he arrives at an RFC, and failure
to do so is grounds for remand. *Briscoe ex. rel. Taylor v.
Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Accordingly, on
remand, the ALJ is instructed to comply with SSR 96-8p when
reassessing Mr. Egan's RFC.

Mr. Egan also argues that the ALJ "ignored" his treating
physician's statement that he "is unable to perform a 40 hour

work week due to his medical conditions." Dr. Mikuzis wrote to the Social Security Administration, in a letter dated February 17, 2004, that "[b]ased upon my medical opinion patient is unable to perform a 40 hour work week due to his medical conditions. Patient is permanently disabled at this time. This is until further notice." R. at 561.

The ALJ, however, recognized that Mr. Egan is not disabled just because his treating doctor says so. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Treating doctors' views control only when "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). Dr. Mikuzis did not support his opinion with references to any medical evidence, R. at 561, thus it was proper for the ALJ to discount Dr. Mikuzis's statement.

## The ALJ's Past Work Finding

Mr. Egan argues that the ALJ wrongly found that he was capable of performing his past work as a corporate manager, as it is generally performed in the national economy. The Commissioner responds that the ALJ's step four finding was supported by substantial evidence.

38

The ALJ must determine the physical and mental demands of
the claimant's past work. *Gotz*, 207 F. Supp. 2d at 896. Past
work can mean either: 1) the actual functional demands of a
particular job that the claimant performed; or 2) the functional
demands and job duties of such an occupation as it is generally
found in the national economy. *Veal v. Bowen*, 833 F.2d 693, 697
(7th Cir. 1987). The ALJ's decision contains no discussion
regarding the demands of Mr. Egan's past work. R. at 13-17.

In addition, the ALJ must determine whether the claimant has
the ability to meet the job demands found in the claimant's past
work, despite the mental or physical limitations of the claimant.
*Gotz*, 207 F. Supp. 2d at 896. In making this determination, the
ALJ cannot simply describe a claimant's job in a generic way,
e.g. "sedentary," and conclude, on the basis of the claimant's
RFC, that he can return to his previous work. *Id.* at 897.
Instead, the ALJ must list the specific physical requirements of
the previous job and assess the claimant's ability to perform
these tasks. *Id.* (citing *Nolen v. Sullivan*, 939 F.2d 516, 518
(7th Cir. 1991)).

Here, the ALJ did not list the physical requirements of Mr.
Egan's previous job, nor did he assess Mr. Egan's ability to
perform those tasks. Instead, the ALJ succinctly stated that Mr.
Egan remained capable of performing a range of sedentary work and
then concluded that he could return to his past relevant work as

39

a corporate manager, based on the testimony of the VE. R. at 16. Caselaw makes clear that this is insufficient. *See, e.g., Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984). The ALJ should correct these errors upon remand as well.

However, Mr. Egan also complains that since his job, as generally performed, is not found in the Dictionary of Occupational Titles (the "Dictionary"), the VE's testimony cannot be used to show that he could perform his past relevant work. Unfortunately, this argument is raised too late.

Since neither Mr. Egan's attorney nor the ALJ, questioned the vocational expert's foundation or reasoning, the ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)("On the record as it stands--that is, with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning--the ALJ was entitled to reach the conclusion she did [to accept the VE's testimony].")

If the basis of the vocational expert's conclusions *is* questioned at the hearing, however, then the ALJ should make an inquiry to find out whether the purported expert's conclusions are reliable. *Id.* Social Security Ruling 00-4p requires the ALJ to "[e]xplain in the determination or decision how any conflict [with the Dictionary] that *has been identified* was resolved."

(emphasis added.) This ruling requires an explanation only if the discrepancy was "identified" - that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation. *Donahue*, 279 F.3d at 446 (dictum). Raising a discrepancy only after the hearing, as Mr. Egan's lawyer did, is too late. *Id.* An ALJ is not obligated to reopen the record under the circumstances presented here. *Id.* On the record as it stands - with no questions asked that reveal any shortcomings in the vocational expert's data or reasoning - the ALJ was entitled to reach the conclusion he did. *Id.*

## The ALJ's Credibility Determinations

Mr. Egan argues that the ALJ made an improper credibility determination regarding his complaints of pain, mental limitations, and difficultly concentrating.[9] The Commissioner responds that the ALJ's findings are supported by substantial evidence.

Pain can be severe and disabling even in the absence of "objective" medical findings. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). The ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence, once the claimant produces medical evidence of an underlying impairment. *Id.* (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996)).

_____

[9] Mr. Egan's brief does not address "mental limitations."

41

The ALJ's decision must be based on the testimony and the medical evidence in the record, *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992), and the ALJ "cannot make his own independent medical determinations about the claimant," *Id.; Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985).

The ALJ wrote that the "[u]sual signs of severe pain are not noted, such as abnormal weight loss, muscle atrophy or problems sleeping." R. at 16. Here, the ALJ impermissibly made his own independent medical determinations regarding Mr. Egan, because the ALJ received no medical testimony on whether abnormal weight loss, muscle atrophy or problems sleeping are signs of severe pain. Indeed, the Seventh Circuit has warned, "Common sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)(rehearing en banc). In addition, the ALJ's own decision includes references to quadriceps atrophy and sleep apnea. R. at 15. The ALJ should also correct this error upon remand.

Next, the Court will address the ALJ's credibility determination with respect to Mr. Egan's complaint of difficulty concentrating, which the ALJ found was not supported by credible evidence. An ALJ's credibility determination is entitled to "special deference" because of the ALJ's unique ability to observe and evaluate the claimant's testimony. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Courts do not disturb an

ALJ's credibility findings unless they are patently wrong. *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002). The ALJ's decision is entitled to this Court's deference.

The ALJ based his decision on two factors, 1) that Mr. Egan had demonstrated "[his] ability to recall his personal history in a consistent, accurate manner," and 2) that Mr. Egan had stated in 2002 that he "[had] no problems concentrating, thinking or remembering." R. at 16.

In addition, Mr. Egan has not pointed to any specific testimony at the hearing or in the record, which, if taken as credible, would contradict the evidence relied on by the ALJ. Rather, Mr. Egan states in his brief that two of his medications are "known to cause fatigue and loss of concentration," and that the ALJ did not ask Mr. Egan whether he "because of the enormous significant [sic] of the hearing, forewent his pain medication in order to be more lucid."

In summary, the Court accepts Mr. Egan's request for remand on the issue of pain, but rejects his request for remand on the issue of concentration.

## Conclusion

For the reasons set forth above, Mr. Egan's Motion for Summary Judgment is GRANTED, in part, and Defendant's Cross Motion for Summary Judgment is DENIED. The case is REMANDED for further proceedings consistent with this Opinion.

Dated: February 1, 2007     ENTERED:

ARLANDER KEYS
United States Magistrate Judge